UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| RAY F. GARMAN, III | : | |
| Debtor | : | Bankruptcy No. 05-37483 |
| GARY SEITZ, Chapter 7 Trustee and MIA MAYER GARMAN | : | |
| | : | |
| Plaintiffs | | |
| v. | : | |
| RAY F. GARMAN, III and WAVERLY DEANS | : | Adversary No. 06-0608 |
| Defendants | : | |

.................................................

MEMORANDUM

.................................................

Presently before me is an emergency motion filed by defendant Waverly Deans "to modify the preliminary injunction to permit the payment of ordinary and necessary living and personal expenses." This motion succeeds two consensual orders in this adversary proceeding. The first, dated November 14, 2006, was a temporary restraining order enjoining Ms. Deans from "dissipating, spending or transferring any of the proceeds that she received from the sale of any interest in PMA [Capital Management Limited]." The second, dated November 27, 2006, extended that injunction against Ms. Deans on a preliminary basis. The consensual preliminary injunction also provided that Ms. Deans had the right to seek relief from that injunction on an emergency basis.

Ms. Deans now seeks to use approximately $15,000 of the frozen PMA sale proceeds for personal expenses through January 2006, including counsel fees, and to use

$75,000 to pay estimated federal income taxes. Her request is supported by the chapter 7 trustee, Gary F. Seitz, Esquire, based upon a tentative settlement agreement reached between these two parties regarding disposition of the PMA sale proceeds. The emergency request is opposed by plaintiff Mia Mayer Garman, who argues that Ms. Deans has no right to use any of the sale proceeds and, alternatively, can borrow funds to pay her living expenses.

A two day trial took place and the following relevant facts were proven.

I.

In December 1996, Mrs. Garman began a protracted divorce proceeding against the chapter 7 debtor, Ray F. Garman, III, in Philadelphia County. In connection with that divorce litigation, Mrs. Garman had asserted, <u>inter alia</u>, that Mr. Garman misused her individual and marital property for his own purposes and had sought recovery against him. The state court appointed a receiver in 1999, who, in part, was to take possession and control of Mr. Garman's various corporate holdings. Ex. M-21. This receiver, David L. Segal, Esquire, ultimately sent a letter to the state court in November 2002 reporting his findings regarding marital property. Ex. M-37. He considered his engagement ended with this letter, which he believes was approved by the state court, and ceased all further activities.

In August 2000, Ms. Deans met Mr. Garman and ultimately entered into a relationship with him. At the time of their meeting, Ms. Deans was about 25 years old and was employed in the field of corporate recruiting. She moved to Philadelphia and

lived with Mr. Garman, and then followed him to Hong Kong around October 2001 when he became employed by a banking institution known as HSBC. Ms. Deans stated that they were engaged to be married, pending Mr. Garman's divorce proceedings, and that she received and wore an engagement ring. Upon arriving in Hong Kong, Ms. Deans was unemployed, had no work visa, and had little or no assets besides those left in the United States, such as a retirement account. Upon her arrival in Hong Kong, Ms. Deans lived with Mr. Garman, and his income or assets were the sole or primary source of payment of all individual and joint living expenses. She volunteered her time at a day-care center and also tutored some neighboring children earning a very modest income.

In January 2002, Ms. Deans met with Mr. Nitin Parakh, Mr. Farhat Malik, and Mr. Christopher Agar. Mr. Parakh was a colleague of Mr. Garman's at HSBC and all three gentlemen knew Mr. Garman. At this meeting, they discussed with Ms. Deans their intended incorporation of a hedge fund management company, and the capital contributions needed to start that company. Ms. Deans believes that this discussion was held with her, rather than Mr. Garman, because the latter was ethically prohibited from participating in the proposed management company due to his employment with HSBC. She further believes that Mr. Parakh left HSBC so that he could ethically participate.

On April 27, 2002, an entity known as PMA Capital Management Ltd. was formed, incorporated in the Cayman Islands. Ex. M-14. The corporation issued 500,000 common stock shares and 75,000 non-voting redeemable shares. Id. The capitalization fund was set at U.S. $500,750. Id. This entity also formed a Hong Kong subsidiary known as PMA Investment Advisors Ltd. Id. Ms. Deans testified that she decided,

without performing due diligence, to invest in PMA, based solely upon her belief that the three gentlemen above-mentioned were very successful and knowledgeable businessmen.

Ms. Deans was informed by them that in order for her to participate in PMA, she would need to invest U.S. $50,000 in two installments. In May 2002, she was asked to contribute the first $25,000. These funds were obtained on her behalf by Mr. Garman, who authorized or took a cash advance from his credit card. The second installment, paid in July 2002, came from Mr. Garman's father (referred to as Dr. Garman), by wire transfer to a company controlled by Mr. Garman and was then immediately tendered to PMA. Exs. M-16, M-17. Dr. Garman testified in a February 2006 state court hearing, Ex. M-40, that he intended this $25,000 transfer as a wedding gift to be used toward a future ceremony, and was not aware of its use as a capital contribution. Ex. M-40 at 84-85. Ms. Deans testified that she considered both $25,000 transfers as loans made to her, but acknowledged that there were no documents memorializing the transactions as loans, nor any discussion of repayment terms or interest rates.

Upon PMA's receipt of $50,000, Ms. Deans obtained title to a 10% interest in PMA. Ex. M-14. Mr. Agar held title to a 10% interest, Mr. Malik held title to a 27% interest, and the "Three H Trust" held title to a 53% interest in PMA. Id. Ultimately, those interests became diluted when Credit Suisse became a shareholder in November 2003. Id; see also Ex. M-13. The evidence presented shows that PMA quickly became a highly profitable entity, and made substantial distributions to its shareholders, including Ms. Deans.

4

In May 2003, Ms. Deans obtained a work visa in Hong Kong, and became employed with the Sunshine Preschool. Her earnings from that employment were extremely modest, about U.S. $9,000 annually. Her distributions from PMA, however, were substantial. In 2003, she made bank deposits of approximately U.S. $472,000 from PMA distributions. Ex. M-19. Her federal income tax return for 2003 discloses on form 2555 foreign earned income of $620,250. Ex. M-26. In 2004, she received distributions from PMA totaling about $390,000, Ex. M-19, and her 2004 federal income tax return on form 2555 notes foreign business income of $389,615. Ex. M-27. In 2005, she received distributions from PMA totaling roughly $433,000, Ex. M-19, although her 2005 federal tax return reports foreign business income of $676,643. Ex. M-28.

Ms. Deans used these PMA distributions to pay, among others, joint and individual creditors in Hong Kong, as well as to pay Mr. Garman's divorce attorney, her relatives, Dr. Garman, and various credit card obligations. Ex. M-19. For example, Exhibit M-19 reflects that Dr. Garman was paid $25,344 by Ms. Deans on July 4, 2003. Ms. Deans also swore that she repaid the $25,000 cash advance from Mr. Garman's credit card with PMA funds.

Prior to February 2004, Mr. Garman formed an entity known as Seitzross International, Ltd., incorporated in the British Virgin Islands. Ex. M-25. He was the only employee of this entity. Ms. Deans believes that Seitzross then established numerous subsidiary corporations doing business in Hong Kong. In February 2004, Ms. Deans paid U.S. $150,000 to Mr. Garman for 90% of his interest in Seitzross (granting him an option to repurchase that interest upon repayment of this sum plus 20% interest per annum). Ex.

5

M-25. She received a certificate reflecting her ownership dated December 5, 2005. Ex. M-24.

Seitzross International, Ltd., as early as December 2003, charged Ms. Deans for monitoring, evaluation and negotiation fees connected with PMA. Ex. M-23 (containing some Seitzross invoices). She also invested or loaned Seitzross funds to be used in its subsidiary companies. Between December 2003 and February 2005, Ms. Deans calculated that she paid Seitzross U.S. $578,500. Ex. M-19. Such payments were made at the request of Mr. Garman, using PMA distribution proceeds, without protest from Ms. Deans. Ms. Deans did not receive any statements regarding her investments in these additional companies, did not appear to request the services purportedly provided by Seitzross, and explained that her payments to this entity were made due to her affection for and trust of Mr. Garman.

In June 2004, the state court entered a divorce decree and also ordered Mr. Garman to pay $6 million to Mrs. Garman. Ex. M-21. At the same time, Mrs. Garman was also awarded, inter alia, "all . . . assets . . . that are currently in [Mr. Garman's] possession and control" or in which he held an ownership interest, which were valued at $1.5 million. Id., at 5. No express mention of PMA or Seitzross is made in this order, nor is there a state court finding in June 2004 that the PMA shares titled in Ms. Deans' name were either marital property or property of Mr. Garman awarded to Mrs. Garman.

Ms. Deans and Mr. Garman returned to the United States in mid-2005 so that Mr. Garman could attend and participate in the state court trial connected with the June 2004 order and his still pending divorce litigation. As of the result of that trial, Mr. Garman was held in civil contempt and incarcerated. After the trial, Ms. Deans remained

6

in the United States and resided in Mr. Garman's parents' summer home, located in Ocean City, New Jersey. Another state court hearing was held on February 3, 2006. Ex. M-40.

At or prior to that February 2006 hearing, Mrs. Garman's attorneys had learned of the PMA investment and raised an ownership issue with the state court. The state court sua sponte issued a freeze order on February 6, 2006, enjoining Ms. Deans from spending or transferring PMA stock or the proceeds therefrom. This order was vacated by the Pennsylvania Supreme Court in August 2006 on due process grounds. Ex. M-39 (reported as Garman v. Garman, 2006 WL 2252067 (Pa. August 4, 2006)).

While the state court freeze order against the PMA stock was in effect, and prior to its vacation on appeal, an offer was made to the PMA shareholders by a Japanese asset management company to purchase all of the company stock. Ex. M-30. In April, 2006, that offer was accepted. Id. Ms. Deans agreed with Mrs. Garman to escrow her portion of the sale proceeds (about US $7.469 million according to Ex. M-34), but there is no evidence that this agreement was approved by the state court. Nor was any evidence of the escrow terms provided.

Once the freeze order was vacated in August 2006, Ms. Deans took the position that the escrow terminated and she was free to spend the funds as she wished. In October 2006, she purchased a vacant lot in Taos, N.M., Ex. M-35, for approximately $300,000 in cash, using the proceeds from the sale of her PMA shares. She also estimates paying about $300,000 in counsel fees. Thus, at the time of the hearing on the instant motion, she had approximately $6.86 million in deposited bank funds. Ex. M-34.

Ms. Dean testified that, at present, she is unemployed and living in Dallas, Texas. She moved to Dallas, where she was born and where some of her family still resides, in February 2006. In February 2006, Mr. Garman remained incarcerated and she testified that she decided to end their engagement by informing Mr. Garman that she was no longer wearing the engagement ring. She further testified that she was emotionally and psychologically upset by the events surrounding Mr. Garman's incarceration and other events, and has since been receiving professional treatment. She further maintains that she presently has no assets with which to pay her living expenses other than those frozen by this court in November 2006. Indeed, she swore that she has fallen behind in utility bills.

She now feels sufficiently recovered emotionally that she has begun the process of looking for employment and anticipates job interviews in January 2007. In addition, a hearing on the trustee's motion to settle his dispute with Ms. Deans is currently scheduled for January 18, 2007.

II.

A.

Mr. Garman filed a voluntary petition in bankruptcy under chapter 7 on October 14, 2005. In August 2006, Mrs. Garman filed a civil action in state court against Mr. Garman and Ms. Deans. This lawsuit, docketed with the same docket number as the divorce litigation, sought to recover the proceeds of the PMA sale from the two

8

defendants. Mrs. Garman alleged that Mr. Garman was the de facto owner of the PMA stock, but he and Ms. Deans "agreed to place title to Defendant, [sic] Garman's ownership interest in [PMA] in the name of Defendant, [sic] Deans as a straw party in order to defeat Defendant, [sic] Garman's obligation to [Mrs. Garman]." Complaint, ¶ 45. Mrs. Garman further averred that Mr. Garman and Ms. Deans agreed that PMA distributions would be paid to Ms. Deans and "used for the benefit of" Mr. Garman, and that Ms. Deans was part of "a conspiracy" to defraud Mrs. Garman. Id., ¶¶ 51, 54. Mrs. Garman also asserted that Ms. Deans breached the escrow agreement, breached a fiduciary duty to Mrs. Garman, aided and abetted in a fraud, was unjustly enriched, engaged in a civil conspiracy, and held the PMA proceeds in constructive or resulting trust for Mrs. Garman. Id.

Ms. Deans and Mr. Garman then filed a notice of removal to District Court pursuant to 28 U.S.C. § 1441 on September 14, 2006, and Mr. Garman filed a suggestion of bankruptcy on September 29, 2006. On October 16, 2006, Mrs. Garman, Ms. Deans, and the chapter 7 trustee, Mr. Seitz, filed a stipulation in District Court agreeing that the issue of the proper ownership of the PMA sale proceeds paid to Ms. Deans should be decided in this bankruptcy forum and the trustee joined as a party plaintiff. The matrimonial issues not involving Ms. Deans were agreed to be remanded back to state court.

On November 2, 2006, the state court approved the stipulation and referred the proceeding to this bankruptcy court. Thereafter, the trustee and Mrs. Garman moved to enjoin Ms. Deans and the preliminary injunction mentioned earlier was entered.

9

B.


Fed. R. Bankr. P. 7065 incorporates Fed. R. Civ. P. 65 (except that a debtor, trustee or debtor in possession need not post security to obtain a restraining order or preliminary injunction). Rule 65(a) authorizes the issuance of a preliminary injunction.

In this circuit, four general elements must be considered before a preliminary injunction may be entered:

> When ruling on a motion for a preliminary injunction, the district court must consider four factors: the likelihood of success on the merits; the extent of irreparable injury from the conduct complained of; the extent of irreparable harm to the defendants if a preliminary injunction issues; and the public interest.

Clean Ocean Action v. York, 57 F.3d 328, 331 (3d Cir. 1995); accord Shire U.S. Inc. v. Barr Laboratories, Inc., 329 F.3d 348, 352 (3d Cir. 2003).

For purposes of the instant motion, Ms. Deans does not challenge that some freeze on the PMA sale proceeds that she controls or possesses, pending a final determination as to ownership, is appropriate. Were she not to prevail, she acknowledges that she could not afford to repay sums spent. See Elliott v. Kiesewetter, 98 F.3d 47, 54-55 (3d Cir. 1996). She requests only that certain funds be released from the freeze so that she can use them to pay expenses she has or will incur in the near future. Only Mrs. Garman presently opposes this request.

In determining whether to release certain funds from the freeze to be used by defendant Deans to pay certain expenses, this court will consider a number of factors including: the likelihood that the plaintiffs will prevail on the merits that defendant Deans has no right to possession or use of the PMA proceeds; the potential harm to this

defendant if the freeze on all of the assets continues; the amount sought to be released to the defendant; the reasonableness and necessity of the expenses; and the availability to the defendant of other sources to pay those reasonable and necessary expenses. See generally In re Krause, 349 B.R. 255 , 259 (Bankr. D. Kan. 2006); see also Weitzman v. Stein, 897 F.2d 653, 658 (2d Cir. 1990).

Initially, I cannot agree with Ms. Deans that a final hearing is likely to yield a determination that the PMA proceeds are truly hers. It may, but it may not. Based upon the evidence presented in connection with the instant motion, a number of the claims asserted in the complaint are unlikely to be proven; certainly there was insufficient evidence at this preliminary hearing regarding breach of contract and breach of fiduciary duty. I also appreciate that the present circumstances—wherein Ms. Deans has possession and control of more than $7 million in Dallas, and Mr. Garman is without influence over those funds and is in Pennsylvania—suggest that Ms. Deans may not have conspired with Mr Garman regarding her titled investment in PMA .

However, I did not hear any testimony from Mr. Garman. Will the current state of affairs render his testimony regarding PMA candid and truthful? I do not know what role he played, if any, in the incorporation or operation of PMA. If he did, then the sale proceeds could be considered to be held by Ms. Deans in constructive trust. See generally Securities and Exchange Commission v. Antar, 831 F. Supp. 380 (D.N.J. 1993). Neither the trustee nor Mrs. Garman have had, to my knowledge, the opportunity in this proceeding to depose Mr. Garman or the other former shareholders of PMA to illuminate Mr. Garman's role, if any. This hearing was conducted expeditiously after Ms. Deans

11

had consented to a freeze. The plaintiffs should not be faulted if they were not completely prepared to refute her testimony.

To date, the evidence reflects that Mr. Garman probably arranged for the investment offer to be made to Ms. Deans. (Otherwise, why seek a capital contribution in January 2002 from an unemployed individual without assets, whom the other shareholders could have known, at most, only for a few months.) Mr. Garman's credit card was the source of the initial capital contribution. His father, Dr. Garman was the source of the second capital contribution. (Dr. Garman testified in state court that these funds were a wedding gift; even if so, did Mr. Garman urge him to make it?) Ms. Deans' testimony that both were viewed by her as loans is uncorroborated by any documents to that effect.

Moreover, the distributions from PMA were used by Ms. Deans to benefit Mr. Garman perhaps as much, if not more, than herself. Not only did she pay joint expenses, but she made payments to Mr. Garman's divorce attorney and substantial payments to Mr. Garman's company, Seitzross. Her attorney argues that Mr. Garman was attempting to take advantage of Ms. Deans only after he learned of the large profits earned by PMA. At that point, he sought to take control of her PMA distributions and she acquiesced to some degree out of love for him, not out of any intent to defraud or conspire his ex-wife or his creditors.

Without now suggesting that there is no evidence to support Ms. Deans' contentions, there is evidence, mentioned earlier, from which one can infer the contrary. There was also testimonial evidence that Ms. Deans submitted an affidavit in state court in an attempt to have Mr. Garman released from civil contempt, and in so doing she

12

allowed his attorneys to phrase her involvement in the establishment of PMA and in her knowledge of Mr. Garman's financial affairs in a manner that could lead one to inaccurate conclusions. Thus, it is appropriate before reaching any final conclusions that the plaintiffs should have additional opportunity to challenge or amplify Ms. Deans' version of events.

Accordingly, the balance of equities supports the continuation of the asset freeze, but subject to reduction to prevent serious hardship to Ms. Deans, and with some protection for the interests of the plaintiffs.

I have reviewed her proposed monthly expenses for December 2006 and January 2007. Ex. M-36. Some, such as holiday gifts to PMA employees and participation in a friend's pre-wedding party are not appropriately paid for by PMA proceeds under the present known facts, and would not constitute a serious hardship if not paid. Others, such as food, utilities, [rent is not listed], health care and health insurance clearly are. Without attempting to micro-manage Ms. Deans financial affairs, I conclude that $4,500 in December 2006 (due to health insurance premium) and $3,500 in January 2007 are reasonably and justifiably paid from PMA assets and will issue an order releasing such amounts from the freeze. This, in my opinion, is preferable to Mrs. Garman's suggestion of having Ms. Deans mortgage the Taos property; the latter could risk its subsequent foreclosure for a loan amount much less than the value of the property.

Insofar as counsel fees and tax payments are concerned, Ms. Deans' request for payment authorization is presently denied. Attorneys have received substantial payments from her in the past few months and can await further events in this litigation

13

without danger that she would be left unrepresented. And there was no evidence offered to corroborate the immediate need for payment of $75,000 for 2006 taxes.

Finally, as further conditions to the modification of the freeze order, I shall direct that Ms. Deans neither transfer nor encumber the Taos property and establish that any PMA proceeds used for her living expenses shall be deducted from that portion of the PMA proceeds determined upon final judgment to be property of Ms. Deans. If judgment on the merits is rendered against her, such that no portion of the PMA proceeds belong to her, then the cost of these expenses may be added as a judgment against her.

An appropriate order shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| RAY F. GARMAN, III | : | |
| Debtor | : | Bankruptcy No. 05-37483 |
| | | |
| GARY SEITZ, Chapter 7 Trustee and MIA MAYER GARMAN | : | |
| | : | |
| Plaintiffs | | |
| v. | : | |
| RAY F. GARMAN, III and WAVERLY DEANS | : | Adversary No. 06-0608 |
| Defendants | : | |

..................................................

ORDER

..................................................

AND NOW, this 22nd day of December 2006, for the reasons stated in the accompanying memorandum, it is hereby ordered that defendant Deans' motion to modify the preliminary injunction order dated November 27, 2006 is granted in part.

Ms. Deans may spend up to $4,500 in December 2006 and $3,500 in January 2007 for ordinary and necessary living expenses, using the sale proceeds she received from PMA to do so. She shall timely file monthly expenditure statements with this court, with receipts for expenses exceeding $200.

It is further ordered that she is preliminarily enjoined from transferring or encumbering the Taos realty now titled in her name, as this realty was purchased recently with PMA sale proceeds.

And it is further ordered that any PMA proceeds used for her monthly expenses in December and January shall be deducted from any portion of the PMA proceeds determined upon final judgment to be property of Ms. Deans. If judgment on the merits is rendered against her, such that no portion of the PMA proceeds belong to her, then the cost of these expenses may be added as a judgment against her.

_____
BRUCE FOX
United States Bankruptcy Judge

copies:

Scott M. Orloff, Esq.
Willig Williams & Davidson
1814 Chestnut Street
Philadelphia, PA 19103

Samuel Israel, Esq.
Fox Rothschild, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291

Edmond M. George, Esq.
Obermayer Rebmann Maxwell & Hippel, LLP
1617 John F. Kennedy Blvd.
One Penn Center, Suite 1900
Philadelphia, PA 19103