UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                   :       Chapter 7

RAY F. GARMAN, III                      :

            Debtor                      :       Bankruptcy No. 05-37483bif

_____

GARY SEITZ, Chapter 7 Trustee           :
and MIA MAYER GARMAN
                                        :
            Plaintiffs
        v.                              :

RAY F. GARMAN, III                      :
and WAVERLY DEANS                               Adversary No. 06-0608
            Defendants                  :

................................................

MEMORANDUM

................................................

Before me is a second motion of the plaintiff/trustee, Gary Seitz, Esquire, to

approve an amended settlement agreement entered into with defendant Waverly Deans

and co-plaintiff Mia Mayer Garman (hereinafter "Ms. Mayer").   A one-day hearing was

held on the instant motion with all parties participating.  Furthermore, at the trustee's

request, I incorporated the evidence offered over two days concerning defendant Deans'

request to modify a preliminary injunction entered in this proceeding, as well as evidence

offered in support of the trustee's first motion to approve a settlement.  (That first

settlement motion was withdrawn prior to any adjudication.)

At the conclusion of the evidentiary hearing, the debtor and debtor's

counsel, Weir & Partners, LLP, which has filed a proof of claim in this case, renewed

their objections to the trustee's amended settlement.  I have learned that those objections

have just been withdrawn.  For the following reasons,[1] I shall grant the trustee's amended

motion to settle this proceeding, finding that the settlement is fair and equitable.  Cf. In re

Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986) (approval of

trustee motion to sell under section 363(b)(1) requires a bankruptcy court finding of good

faith).[2]


I.


In December 1996, Ms. Mayer began a protracted divorce proceeding

against the chapter 7 debtor, Ray F. Garman, III, in Philadelphia County.  In connection

with that divorce litigation, Ms. Mayer asserted, inter alia, that Mr. Garman misused her

individual as well as their marital property for his own purposes, and sought recovery

against him for this misuse.

In August 2000, Ms. Deans met Mr. Garman and ultimately entered into a

relationship with him.  At the time of their meeting, Ms. Deans was about 25 years old

and was employed in the field of corporate recruiting.  She moved to Philadelphia and

lived with Mr. Garman, and then followed him to Hong Kong around October 2001 when

he became employed by a financial institution known as HSBC.  Ms. Deans stated that

they were engaged to be married pending Mr. Garman's divorce proceedings.  Upon

_____

[1]Given the extensive evidence offered, the objections that had been lodged, and the complicated terms of the settlement, the following analysis is more detailed than would otherwise be warranted.

[2]As will be seen below, the Third Circuit Court of Appeals has explained that a trustee compromise of litigation can be analogized to the sale of an intangible asset under section 363(b)(1).

arriving in Hong Kong, Ms. Deans was unemployed, had no work visa, and had little or no assets besides those left in the United States, such as a modest retirement account.

In January 2002, Ms. Deans met with Mr. Nitin Parakh, Mr. Farhat Malik, and Mr. Christopher Agar. Mr. Parakh was a colleague of Mr. Garman's at HSBC and all three gentlemen knew Mr. Garman. At this meeting, they discussed with Ms. Deans their intended incorporation of a hedge fund management company and the capital contributions needed to start that company. Both Ms. Deans and Mr. Garman testified that this investment opportunity discussion was held with her, rather than with Mr. Garman, because the latter was ethically prohibited from participating in the proposed management company due to his employment with HSBC. Purportedly, Mr. Parakh left HSBC to avoid this problem.

Mr. Garman testified, and for purposes of this settlement motion I would probably find at a trial on the merits, that the offer to Ms. Deans to invest in this incipient hedge fund management company came at the request of Mr. Garman. As Mr. Garman was known to the other individuals, and as Ms. Deans was unemployed without assets of her own or experience in investment management, it seems unlikely that she would have been viewed as a potential investor but for her association with Mr. Garman.

On April 27, 2002, an entity known as PMA Capital Management Ltd. was formed, incorporated in the Cayman Islands. Ex. M-14. The corporation issued 500,000 common stock shares and 75,000 non-voting redeemable shares. Id. The capitalization fund was set at U.S. $500,750.[3] Id. This entity also formed a Hong Kong subsidiary known as PMA Investment Advisors Ltd. Id. Ms. Deans acknowledged that she decided,

---

[3]All dollar amounts used in this memorandum refer to U.S. dollars.

3

without performing due diligence, to invest in PMA based solely upon her belief that the

three gentlemen above-mentioned were very successful and knowledgeable businessmen.

Mr. Garman maintains that her decision to invest in PMA arose from his instructions.

Ms. Deans does not agree that she acted according to instructions but decided on her own

to invest.

Ms. Deans was informed that in order for her to participate in PMA, she

would need to invest a total of $50,000 in two installments.  In May 2002, she was asked

to contribute the first $25,000.  These funds were obtained on her behalf by Mr. Garman,

who authorized or took a cash advance from his credit card.  The second installment, paid

in July 2002, came from Mr. Garman's father (hereinafter "Dr. Garman"), by wire

transfer to a company controlled by Mr. Garman, Seitzgroup,[4] and was then immediately

tendered to PMA.  Exs. M-16, M-17.  Dr. Garman testified in a February 2006 state court

hearing, Ex. M-40, that he intended this $25,000 transfer as a wedding gift to be used

toward a future ceremony and was not aware of its use as a capital contribution.  Ex. M-

40 at 84-85.  Mr. Garman, the debtor, testified that he urged his father to make this gift.

It is unclear from the testimony offered whether the gift was intended by Mr. Garman to

be made to Ms. Deans individually or jointly with Mr. Garman.

Ms. Deans testified that she considered both $25,000 transfers to her as

loans, but acknowledged that there were no documents memorializing the transactions as

loans, nor any discussion of repayment terms or interest rates.  Mr. Garman testified that

the $25,000 cash advance obtained from his credit card may have repaid Ms. Deans for

---

[4]This company, and others of Mr. Garman with "Seitz" in the name, have no
relationship to Gary Seitz, the chapter 7 trustee appointed in this case.

4

expenses she incurred on his behalf prior to moving to Hong Kong, thus suggesting that these funds were her property.

Upon PMA's receipt of $50,000, Ms. Deans obtained title in her name only to a 10% interest in PMA, not later than October 2003. Ex. M-14. Mr. Agar held title to a 10% interest, Mr. Malik held title to a 27% interest, and the "Three H Trust" held title to a 53% interest in PMA. Id. Ultimately, those interests became diluted when Credit Suisse became a shareholder in November 2003. Id.; see also Ex. M-13. The evidence presented shows that PMA quickly became a highly profitable entity, making substantial distributions to its shareholders, including Ms. Deans.

In 2003, she made bank deposits of approximately $472,000 from PMA distributions. Ex. M-19. Her federal income tax return for 2003 discloses on form 2555 foreign earned income of $620,250. Ex. M-26. In 2004, she received distributions from PMA totaling about $390,000, Ex. M-19, and her 2004 federal income tax return on form 2555 notes foreign business income of $389,615. Ex. M-27. In 2005, she received distributions from PMA totaling roughly $433,000, Ex. M-19, although her 2005 federal tax return reports foreign business income of $676,643. Ex. M-28.

Ms. Deans used these PMA distributions to pay, among others, her joint (with Mr. Garman) and individual creditors in Hong Kong, as well as to pay Mr. Garman's divorce attorney, her relatives, Dr. Garman, and various credit card obligations. Ex. M-19. For example, Exhibit M-19 reflects that Dr. Garman was paid $25,344 by Ms. Deans on July 4, 2003. Ms. Deans also swore that she repaid the $25,000 cash advance from Mr. Garman's credit card with PMA funds.

5

Mr. Garman maintains that the PMA dividends paid to Ms. Deans first went into a joint bank account they held, and later went into an individual bank account of Ms. Deans, opened at his insistence.  He further testified that he "controlled" the disposition of the PMA dividends through an "understanding" he had with Ms. Deans.  Ms. Deans does not agree that she had any understanding or agreement with Mr. Garman regarding the use or control of PMA dividends.

Prior to December 2003, Mr. Garman formed an entity known as Seitzross International, Ltd., incorporated in the British Virgin Islands.  Ex. M-23 (containing some Seitzross invoices).  He was the only employee of this entity.  Ms. Deans believes that Seitzross then established numerous subsidiary corporations doing business in Hong Kong.  In February 2004, Ms. Deans paid $150,000 to Mr. Garman for 90% of his interest in Seitzross (granting him an option to repurchase that interest upon repayment of this sum plus 20% interest per annum).  Ex. M-25.  She received a certificate reflecting her ownership dated December 5, 2005.  Ex. M-24.

Seitzross International, Ltd., as early as December 2003, charged Ms. Deans for monitoring, evaluation and negotiation fees connected with the PMA investment.  Ex. M-23.  She also invested or loaned Seitzross funds to be used in its subsidiary companies. Between December 2003 and February 2005, Ms. Deans calculated that she paid Seitzross $578,500.  Ex. M-19.  Such payments were made by her at the request of Mr. Garman, using PMA distribution proceeds, and without protest from Ms. Deans.  Ms. Deans did not receive any statements regarding her investments in these additional companies, did not appear to request the services purportedly provided by Seitzross, and explained that her payments to this entity were made solely due to her affection for and

6

trust of Mr. Garman, her fiancé.  Mr. Garman countered that these payments were

consistent with the understanding that he would control the PMA dividends.

In June 2004, the state court entered a divorce decree and also entered

various judgments, alimony and support orders against Mr. Garman and in favor of Ms.

Mayer.  Ex. M-21.[5]  In that state court adjudication, Ms. Mayer  was also awarded, <u>inter</u>

_____

[5]The state court order decreed, in relevant part:

2.  Husband, [*sic*] shall pay to Wife reasonable counsel fees and
costs in the amount of Five Hundred Thousand ($500,000.00)
Dollars, within 30 days from the date of this Order.  If said sum is
not paid, then a judgment shall be entered of record, which shall
not be dischargeable in any subsequent bankruptcy proceeding.

5.  Wife is awarded all remaining assets, accounts receivable,
judgments (pre-marital and marital) that are currently in the
possession and control of Husband or any business entity in which
Husband currently has any ownership interest in or has had any
ownership interest in during the past seven years.  These assets are
valued by the Court for purposes of Equitable Distribution at One
Million Five Hundred Thousand ($1,500,000.00) Dollars.
Husband is directed to surrender these assets to Scott M. Orloff,
Esquire, attorney for the Wife within Thirty (30) days of this
Order.

6.  Wife is awarded Six Million ($6,000,000.00) Dollars in cash.
Husband is directed to surrender to Scott M. Orloff, Esquire, the
sum of Six Million ($6,000,000.00) Dollars within thirty (30) days.
A judgment securing payment of the above noted sum shall be
entered of record and shall not be dischargeable in any subsequent
bankruptcy proceeding.

7.  Scott M. Orloff, Esquire is directed to submit three separate
certifications of Husband's compliance upon his receipt of the
property, funds, and ownership interest set forth in paragraph[s] 4,
5 and 6 above.

8.  In the event that Mr. Orloff fails to certify Husband's
compliance with Paragraph Number Five (5) of this Order, a Three
Million ($3,000,000.00) Alimony arrearage (judgment) will be set

(continued...)

alia, "all . . . assets . . . that are currently in [Mr. Garman's] possession and control" or in which he held an ownership interest, which were valued at $1.5 million.  Id., at ¶ 5.  No express mention of PMA or Seitzross is made in this order, nor is there a state court finding in June 2004 that the PMA shares titled in Ms. Deans' name were either marital property or property of Mr. Garman awarded to Ms. Mayer.

Another state court hearing was held on February 3, 2006.  Ex. M-40.  At or prior to that February 2006 hearing, Ms. Mayer's attorneys learned of the PMA investment and asserted her ownership of this asset in the state court.  The state court sua sponte issued a freeze order on February 6, 2006, enjoining Ms. Deans from spending or transferring PMA stock or the proceeds therefrom.  This order was vacated by the Pennsylvania Supreme Court in August 2006 on due process grounds, as Ms. Deans had

---

[5](...continued)
by the Domestic Relations Department at PACES Number #669004113 on the 35th day after the entry of this Order.

9.  In the event that Mr. Orloff fails to certify Husband's compliance with Paragraph Number Six (6) of this Order, a Twelve Million ($12,000,000.00) Dollar Alimony arrearage (judgment) will be set by the Domestic Relations Department at PACES Number #669004113 on the 35th day after the entry of this Order.

11.  In addition to Husband's current child support obligation, Mr. Ray Garman, III is directed to pay Ten Thousand ($10,000.00) Dollars per month toward any arrearage for child support, spousal support, APL, or any Alimony obligation that has been set forth by this Court.  Any funds used to satisfy the Alimony, APL, Spousal Support arrearage shall be taxable to wife and tax deductible to Husband.

13.  Husband shall pay to Wife Alimony in the amount of Three Thousand ($3,000.00) Dollars per month for [a] period of sixty (60) months.

Ex. M-21.

never been joined as a party.  Ex. M-39 (reported as <u>Garman v. Garman</u>, 2006 WL
2252067 (Pa. August 4, 2006)).

While the state court freeze order against the PMA stock was in effect, prior
to its vacation on appeal, an offer was made to the PMA shareholders by a Japanese asset
management company to purchase all of the company stock.  Ex. M-30.  In April 2006,
that offer was accepted.  <u>Id</u>.  Ms. Deans agreed with Ms. Mayer to escrow her portion of
the sale proceeds (about $7.469 million according to Ex. M-34), but there is no evidence
that this agreement was approved by the state court.  Nor was any evidence of the escrow
terms provided.

Once the freeze order was vacated in August 2006, Ms. Deans took the
position that the escrow terminated and she was free to spend the funds as she wished.  In
October 2006, she purchased a vacant lot in Taos, New Mexico, Ex. M-35, for
approximately $300,000 in cash, using the proceeds from the sale of her PMA shares.
She also estimated paying about $300,000 in counsel fees from the sale proceeds.  Thus,
at the time of the hearing on the instant settlement motion, she had approximately $6.9
million in deposited bank funds.  Ex. M-34.

Mr. Garman acknowledged that since the later part of 2005 or early 2006,
Ms. Deans has refused to follow his wishes concerning the PMA dividends and the sale
proceeds.  He maintains that he asked Ms. Deans to agree to tender all of the sale
proceeds to Ms. Mayer in satisfaction of his outstanding obligations to her under the June
2004 state court decree and that she declined.

Mr. Garman filed a voluntary petition in bankruptcy under chapter 7 on
October 14, 2005.  In August 2006, Ms. Mayer filed a civil action in state court against

Mr. Garman and Ms. Deans.  This lawsuit, docketed with the same docket number as the

divorce litigation, sought to recover the proceeds of the PMA sale from the two

defendants.  Ms. Mayer alleged that Mr. Garman was the de facto owner of the PMA

stock, but he and Ms. Deans "agreed to place title to Defendant, [sic] Garman's

ownership interest in [PMA] in the name of Defendant, [sic] Deans as a straw party in

order to defeat Defendant, [sic] Garman's obligations to [Ms. Mayer]."  Complaint, ¶ 45.

Ms. Mayer further averred that Mr. Garman and Ms. Deans agreed that PMA distributions

would be paid to Ms. Deans and "used for the benefit of" Mr. Garman, and that Ms.

Deans was part of "a conspiracy" to defraud Ms. Mayer.  Id., ¶¶ 51, 54.  Ms. Mayer also

asserted that Ms. Deans breached the escrow agreement, breached a fiduciary duty to Ms.

Mayer, aided and abetted in a fraud, was unjustly enriched, engaged in a civil conspiracy,

and held the PMA proceeds in constructive or resulting trust for Ms. Mayer.  Id.  This

complaint primarily sought relief in favor of Ms. Mayer against Ms. Deans.  No relief is

sought against Mr. Garman other than to the extent he held any interest in the PMA

assets.

Ms. Deans and Mr. Garman then filed a notice of removal to the District

Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1441, on

September 14, 2006, and Mr. Garman filed a suggestion of bankruptcy on September 29,

2006.  On October 16, 2006, Ms. Mayer, Ms. Deans, and the chapter 7 trustee, Mr. Seitz,

filed a stipulation in District Court.  This stipulation joined the trustee as co-plaintiff in

the litigation and agreed that the issue of the ownership of the PMA sale proceeds paid to

Ms. Deans would be decided in this bankruptcy forum.  The matrimonial issues not

involving Ms. Deans were agreed to be remanded back to state court.

10

On October 18, 2006, the trustee was authorized to engage the law firm of Fox Rothschild LLP as his counsel. Without opposition from any creditors, trustee's counsel was to be compensated on a contingent fee basis for representing Mr. Seitz in this case. See generally 11 U.S.C. § 328(a). The minimum percentage allowance was 30%; the maximum was 40% of net recovery of funds collected.

On November 2, 2006, the district court approved the stipulation and referred this adversary proceeding to this bankruptcy court. Thereafter, the trustee and Ms. Mayer moved to enjoin Ms. Deans, and a preliminary injunction was entered by agreement freezing the assets.[6]

On February 16, 2007, the state court issued an order again holding Mr. Garman in civil contempt of the June 2004 order. Among the factual findings made by the state forum was that Mr. Garman failed to comply with paragraph 5 of the June 2004 order directing him to surrender all of his assets to Ms. Mayer.

For purposes of this contested matter, I also take judicial notice of certain filings made in this chapter 7 bankruptcy case. See generally Fed. R. Evid. 201.

First, only the following proofs of claim have been filed in this case (and the claims bar date has long expired):

> 1. Bank of America (Asia) Ltd. in the amount of $21,355; secured claim with a motor vehicle as collateral

> 2. PA Department of Revenue in the amount of $4,162.98, with $656.44 asserted as a priority claim and $3,506.54 as an unsecured claim

---

[6]I have since approved two modifications of the injunction to permit Ms. Deans to use funds to pay certain living expenses and expenses associated with her attending hearings in this court.

3. Internal Revenue Service in the amount of $39,633.40, with $15,363.64 claimed as priority and $24,269.76 as unsecured

4. Weir & Partners, LLP in the amount of $887,995.09, as an unsecured claim

5. Mia Mayer Garman in the amount of $15,800,000 with $500,000 unsecured and $15,300,000 as secured. The collateral is purported to be "real estate," "motor vehicle." The proof of claim also states: "All property owned in debtor's name belongs to creditor Mia Mayer. To the extent Debtor's property is not owned by creditor Mayer, Creditor Mayer has a secured priority interest in the property."

Second, in Mr. Garman's bankruptcy schedules and statement of financial affairs, he does not disclose any interest in PMA or the sale proceeds from PMA. He does disclose a 10% interest in Seitzross International.

Finally, Mr. Garman commenced an adversary proceeding against Ms. Mayer seeking a determination that at least some of the pre-bankruptcy debts established by the June 2004 state court order are dischargeable in his bankruptcy case. Ms. Mayer has filed an answer and counterclaim asserting that all of her claims against the debtor arising from the June 2004 order are nondischargeable.

II.

On March 9, 2007, the chapter 7 trustee, Ms. Mayer and Ms. Deans entered into a settlement agreement that is the subject of the instant dispute. Ex. T-4. The settlement agreement would end any injunctive relief against Ms. Deans and, in effect,

resolve the adversary proceeding in full by distributing the PMA sale proceeds in Ms.

Deans' possession.[7]  In relevant part this complicated settlement agreement provides:

> Ms. Deans agrees to pay to the trustee all funds remaining from the sale of PMA stock currently held in her frozen bank account, in the amount of $6,937,127.68 (plus accruing interest).  Ex. T-4 (Settlement Agreement, ¶¶ 15, 17(a)).

> Ms. Deans will then be paid by the trustee $1,125,000, plus retain any other funds and property in her possession, including the Taos, New Mexico realty.  Id. at ¶ 17(b).

> Ms. Deans will also "execute a blank stock power transferring her interest in Seitzross International and/or any other company allegedly conveyed by the Debtor to Deans, to be held in escrow by the Trustee," and will release any interest in any joint bank accounts held with Mr. Garman.  Id. at ¶ 17(m).

> Ms. Deans "warrants and represents that none of the Proceeds or property retained by Deans under and pursuant to this Settlement shall be used for the benefit of the Debtor."  Id. at ¶ 17(s).  If she breaches this representation, Ms. Mayer may seek liquidated damages from her of $250,000.  Id.

> In addition to receiving $1,125,000, Ms. Deans "shall be entitled to assert an unsecured prepetition claim of $2,500,000" to which the trustee agrees not to object.  Id. at ¶ 17(i).  This unsecured claim can only receive a pro rata distribution from the PMA assets, but is subordinated to other unsecured creditors until those creditors receive a 10% dividend from those assets.  Id.

> Ms. Mayer will receive a distribution from the trustee of $3,875,000 "as an equitable distribution pursuant to paragraph 5 of the June 2004 Order."  Id. at ¶ 17(c).  She will also be allowed a general unsecured claim of $7,500,000.  Id. at ¶ 17(i).  This unsecured claim can only receive a pro rata distribution from the PMA assets, but is subordinated to other unsecured creditors until those creditors receive a 10%

---

[7]Since there is no relief sought against Mr. Garman in this proceeding beyond the adjudication of the PMA assets, it would appear that the settlement intends to completely resolve this litigation.

dividend from those same assets. Id.  The trustee agrees not to object to this claim.

Fox Rothschild LLP agrees to a cap on its fees from this settlement at $500,000.  Id., ¶ 17(e).  The trustee agrees to a commission cap of $175,000 from this settlement.  Id., ¶ 17(f).  The trustee shall set aside $30,000 from the settlement fund to pay his accountant.  Id., ¶ 17(h).

The trustee and Ms. Mayer will dismiss with prejudice their lawsuit against Ms. Deans and any other litigation they may have instituted against her in any other court.  Id. at ¶ 17(p).  Furthermore, Ms. Deans and the trustee agree not to assert a position contrary to Ms. Mayer's in connection with her non-dischargeability claim.  Id. at ¶ 17(t).

The bankruptcy estate will prepare and file all required tax returns in connection with the liquidation of the PMA asset, and pay those taxes, estimated to be $969,000.00  Id. at ¶ 17(d).  Ms. Deans and Ms. Mayer will have no tax liability "for any tax due by Debtor's estate."  Id.

The trustee, on behalf of the bankruptcy estate, Ms. Deans and Ms. Mayer then agree to "remise, release, discharge and acquit each other" from any claims "now existing or hereafter arising" including those relating to the litigation.  Id. at ¶ 17(l).  (This release is qualified by ¶¶ 17(k), 17(m)).

In response to the trustee's motion to approve the amended settlement agreement two objections were filed, but they have now been withdrawn.  Accordingly, no creditor or other party in interest opposes this settlement.

14

III.


A.


The present motion is brought by the chapter 7 trustee pursuant to Fed. R.

Bankr. P. 9019(a).  When a bankruptcy trustee seeks to compromise a dispute, he must

seek court approval on notice and hearing.  See generally, e.g., In re Martin, 91 F.3d 389

(3d Cir. 1996).  The requirement that the bankruptcy trustee obtain court approval for a

compromise of litigation stems from 11 U.S.C. § 363(b), see Northview Motors, Inc. v.

Chrysler Motors Corp., 186 F.3d 346, 350-51 (3d Cir. 1999), and Fed. R. Bankr. P.

9019(a), the latter of which states:

> (a)  Compromise.  On motion by the trustee and after notice
> and a hearing, the court may approve a compromise or
> settlement. Notice shall be given to creditors, the United
> States trustee, the debtor, and indenture trustees as provided
> in Rule 2002 and to any other entity as the court may direct.

When a bankruptcy trustee seeks authority to compromise a single claim or

dispute, the criteria by which this request is reviewed is well established:

> This particular process of bankruptcy court approval [of the
> trustee's motion to settle] requires a bankruptcy judge to
> assess and balance the value of the claim that is being
> compromised against the value to the estate of the acceptance
> of the compromise proposal.  Taking our cue from Protective
> Committee Stockholders of TMT Trailer Ferry, Inc. v.
> Anderson, 390 U.S. 414, 424-25, 88 S. Ct. 1157, 20 L. Ed. 2d
> 1 (1968), we recognize four criteria that a bankruptcy court
> should consider in striking this balance:  (1) the probability of
> success in litigation;  (2) the likely difficulties in collection;
> (3) the complexity of the litigation involved, and the expense,
> inconvenience and delay necessarily attending it;  and (4) the
> paramount interest of the creditors.  See In re Neshaminy
> Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986).

15

In re Martin, 91 F.3d at 393; accord In re Nutraquest, Inc., 434 F.3d 639, 644-45 (3d Cir.

2006).

   The district court decision cited by the Third Circuit Court of Appeals had

framed the purpose of court review of a trustee's settlement proposal in the following

manner:

> Rule 9019(a) of the Rules of Bankruptcy Procedure provides
> that "[o]n motion by the trustee and after hearing on notice to
> the creditors, . . . the court may approve a compromise or
> settlement." Approval of the settlement lies within the sound
> discretion of the Bankruptcy Court. . . . In deciding whether
> to approve a settlement, the court must determine whether the
> proposed settlement is in the best interest of the estate. . . .
>
> In exercising its discretion regarding whether to approve a
> trustee's application to settle a controversy, relevant criteria
> which the Bankruptcy Court may consider include: (1) the
> probability of success in the litigation; (2) the likely
> difficulties in collection; (3) the complexity of the litigation
> involved, and the expense, inconvenience and delay
> necessarily attending it; and (4) the paramount interests of the
> creditors. . . . In determining whether to approve the trustee's
> application to settle a controversy, the Bankruptcy Court does
> not substitute its judgment for that of the trustee. [In re Carla
> Leather, Inc., 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984), aff'd,
> 50 B.R. 764 (S.D.N.Y. 1985).] "Nor is the court 'to decide
> the numerous questions of law and fact raised by [objections]
> but rather to canvass the issues to see whether the settlement
> fall[s] below the lowest point in the range of
> reasonableness.'" Id., quoting [In re W.T. Grant Co., 699
> F.2d 599, 608 (2d Cir.), cert. denied sub nom. Cosoff v.
> Rodman, 464 U.S. 822 (1983)]. In addition, "[b]ecause the
> bankruptcy judge is uniquely situated to consider the equities
> and reasonableness of a particular compromise, approval or
> denial of a compromise will not be disturbed on appeal absent
> a clear abuse of discretion." [In re Patel, 43 B.R. 500, 505
> (N.D. Ill. 1984)] (citations omitted).

In re Neshaminy Office Bldg. Associates, 62 B.R. 798, 803 (E.D. Pa. 1986) (citations

omitted).

Thus, in deciding whether to approve a particular compromise, courts apply various criteria to ensure that the trustee acts in the best interests of the estate.  See, e.g., In re Nutraquest, Inc., 434 F.3d at 644 (the settlement must be "fair and equitable"); Matter of Energy Co-op, Inc., 886 F.2d 921, 927 (7th Cir. 1989) ("The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate.").  Moreover, "[t]he Trustee, as proponent of the proposed settlement, has the burden of persuasion that the settlement is in the best interest of the estate."  In re Bell & Beckwith, 93 B.R. 569, 574 (Bankr. N.D. Ohio 1988); see Matter of AWECO, Inc., 725 F.2d 293 (5th Cir.), cert. denied, 469 U.S. 880 (1984); In re Neshaminy Office Bldg. Associates.

In deciding whether to approve a compromise, the judgment of the bankruptcy fiduciary should be given some deference.  See In re Del Grosso, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989).  Nevertheless, a court cannot simply approve a settlement because the trustee so moves.  See In re Nutraquest, Inc., 434 F.3d at 644 ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."); In re American Reserve Corp., 841 F.2d 159 (7th Cir. 1987).  The trustee must demonstrate that the proposed settlement is in the best interest of the estate.  Further, support from creditors or is a factor which may also be considered, although it is not dispositive.  See In re Nutraquest, Inc., 434 F.3d at 645; In re American Reserve Corp., 841 F.2d at 161-62; cf. In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 812 (3d Cir.) (among the factors that a court should consider in approving a class settlement under Fed. R. Civ. P. 23(e) is the opposition of plaintiff class members to

the proposed settlement), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u> <u>General Motors Corp. v. French</u>, 116 S.

Ct. 88 (1995).

      At bottom, once all relevant factors are considered, a bankruptcy court

should generally approve a trustee's settlement proposal so long as it is "fair and

equitable, " <u>In re Nutraquest, Inc.</u>, 434 F.3d at 644, and does not "fall below the lowest

point in the range of reasonableness." <u>In re W.T. Grant & Co.</u>, 699 F.2d 599, 608 (2d

Cir.), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u> <u>Cosoff v. Rodman</u>, 464 U.S. 822 (1983).

      In deciding whether to approve a trustee's proposed compromise of a claim,

a bankruptcy court typically will examine the likelihood that the trustee will prevail

(either in her claim or in her defense), and the likely costs to be incurred by the trustee,

and compare the likely risks and costs to the estate with the consideration to be either

received or provided by the estate in settlement. <u>See</u>, <u>e.g.</u>, <u>In re Martin</u>, 91 F.3d at 393. If

the trustee is the plaintiff, a court roughly values the trustee's claim (including litigation

costs) and balances that against the amount the trustee will receive via settlement. If the

settlement does not provide close to equal or greater value than the estimated value of the

claim (including the trustee's ability to collect from the defendant), the estate is

compromising an asset for which it is not receiving fair compensation therefore approval

should be denied. Conversely, if the trustee proposes to compromise a claim made

against the estate, a court again values this claim and insures that the settlement does not

involve clear overpayment by the estate to the specific creditor. <u>See generally</u> <u>In re</u>

<u>Nutraquest, Inc.</u>

      In either instance, the role of the court in deciding whether to exercise its

discretion to approve or disapprove a proposed compromise (with some deference to the

judgment of the trustee) is to insure that the bankruptcy estate—i.e., the interest of

creditors—is not adversely affected by the proposed settlement with a particular creditor

or third party.  The decision to approve or disapprove a settlement pursuant to rule

9019(a) looks primarily to whether the proposed settlement is in the best interests of the

bankruptcy estate.  See, e.g. In re Bell & Beckwith, 87 B.R. at 478; In re Neshaminy

Office Bldg. Associates, 62 B.R. at 803; In re Paris Industries Corp., 106 B.R. 339

(Bankr. D. Me. 1989) (settlement approved as in best interest of debtor's estate over

objections of debtor's former director and officers, who were not released from liability

by the agreement and who faced potential indemnification claims).  A bankruptcy court

would not disapprove of a compromise because the party settling with the trustee is

paying too much or is receiving too little.  Although the court may consider the fairness of

the settlement to non-settling parties, see In re Nutraquest, Inc., 434 F.3d at 645, it is the

interests of the bankruptcy estate (i.e., its creditors) that are paramount.

IV.

A.

As noted above, at present, there is a frozen bank account titled in Ms.

Deans in the approximate amount of $6.9 million.  Ms. Deans also has title to a property

in Taos, New Mexico, purchased for $300,000 using PMA proceeds.  Thus, total PMA

proceeds available for the bankruptcy estate, were the trustee to prevail, would be $7.2

million.  And there is no concern, if this proceeding were decided in favor of the trustee

after trial on the merits, with the trustee collecting on his judgment.  Furthermore, given

the contingent fee agreement, the cost of litigation to the trustee is not a significant

consideration in deciding whether to approve this proposed settlement.

Whether the trustee would prevail on the merits is less clear.  In this

adversary proceeding, Ms. Deans asserts that these assets are titled in her name and

rightfully belong to her.  In support of her ownership claim, Ms. Deans can point to her

continuous title and possession of the asset.  Cf. Willcox v. Stroup, 467 F.3d 409, 412

(4th Cir.  2006), petition for certiorari filed, 75 USLW 3474 (Feb 21, 2007):

> The importance of possession gave rise to the principle that
> "[p]ossession of property is indicia of ownership, and a
> rebuttable presumption exists that those in possession of
> property are rightly in possession."  73 C.J.S. Property § 70
> (2004).  The common law has long recognized that "actual
> possession is, prima facie, evidence of a legal title in the
> possessor."  William Blackstone, 2 Commentaries.  See, e.g.,
> Edward Coke, 1 Commentary upon Littleton 6.b. (19th ed.
> 1832) (strong presumption of ownership created by
> "continuall and quiet possession"); Jeffries v. Great W. Ry.
> Co. (1856) 119 Eng. Rep. 680 (K.B.) ("[T]he presumption of
> law is that the person who has possession has the property.").
>
> This presumption has been a feature of American law almost
> since its inception.  "Undoubtedly," noted the Supreme Court,
> "if a person be found in possession . . . it is prima facie
> evidence of his ownership." Ricard v. Williams, 20 U.S. (7
> Wheat.) 59, 105, 5 L. Ed. 398 (1822).  Almost eighty years
> later, the Court reaffirmed, "If there be no evidence to the
> contrary, proof of possession, at least under a color of right, is
> sufficient proof of title." Bradshaw v. Ashley, 180 U.S. 59,
> 63, 21 S. Ct. 297, 45 L. Ed. 423 (1901).  See also, Oliver
> Wendell Holmes, The Common Law 241 (1881) ("The
> consequences attached to possession are substantially those
> attached to ownership, subject to the question of the
> continuance of possessory rights. . . .").

Moreover, this PMA investment occurred before the Pennsylvania state court's June 2004 order; thus, Ms. Deans could not have conspired in order to defeat its directives to Mr. Garman.[8]

Ms. Mayer also contends that she is the true owner of the PMA sale proceeds. In support of her contention, she can emphasize the source of funds used by Ms. Deans for investment in PMA, how the dividend proceeds were used to benefit Mr. Garman until the sale of the stock interest, and other circumstantial evidence. Of course, such circumstantial evidence, if persuasive, would only support a finding that Mr. Garman held either an individual or joint interest in the PMA asset. To prove her ownership, Ms. Mayer must also demonstrate that the state court ordered that Mr. Garman's interest in this asset be conveyed to Ms. Mayer. In support of this latter contention, she will emphasize, among other facts, that part of the funds used by Ms. Deans to purchase the PMA stock came from Dr. Garman through Seitzross, a company that was mentioned in a state court order favoring Ms. Mayer.

The trustee, to prevail on his claim that the PMA sales proceeds are part of the chapter 7 estate, must demonstrate that Mr. Garman held an ownership interest in PMA stock titled in Ms. Deans' name, and which interest either continued until the date of his bankruptcy filing, October 14, 2005, see 11 U.S.C. § 541(a); 5 Collier on Bankruptcy, ¶ 541.01 (15th ed. rev. 2007), or was conveyed by an avoidable transfer. If such interest existed but were held in constructive or resulting trust in favor of Ms.

---

[8]I recognize that there may exist earlier state court orders against Mr. Garman that could support a theory that title to the PMA investment was intentionally placed in Ms. Deans' name so as to prevent recovery by Ms. Mayer. I simply note that in deciding this settlement motion, the parties' focus has been the June 2004 order, and that order post-dates the investment in PMA.

Mayer, the asset would not be property of the estate.  See City of Farrell v. Sharon Steel

Corp., 41 F.3d 92, 99 (3d Cir. 1994); In re Oster, 261 B.R. 599, 601-02 (Bankr. M.D. Pa.

2000).  Thus, the trustee can emphasize some of the same circumstantial evidence as Ms.

Mayer—in order to defeat Ms. Deans' title claim—but must also demonstrate that the

state court did not transfer Mr. Garman's interest in the PMA stock to Ms. Mayer prior to

his bankruptcy filing.  And to the extent the trustee were to argue that Mr. Garman's

testimony concerning a prior "understanding" between himself and Ms. Deans regarding

the PMA investment, other parties will emphasize Mr. Garman's previous representations

regarding ownership and his bankruptcy schedules.

       Thus, the competing ownership claims of all three parties to the PMA sales

assets are not frivolous, and it is reasonable for the trustee to seek some sort of

compromise.  There are three scenarios in which the trustee would recover no funds on

behalf of the estate: If Ms. Deans or Ms. Mayer are found to be the sole owners of the

PMA proceeds; or if Ms. Deans and Mr. Garman are found to be co-owners, with Mr.

Garman's interest transferred by the June 2004 state court order to Ms. Mayer (or by

some earlier order).

       Further supporting the premise of compromise is the trustee's concern that

testimony from the Hong Kong incorporators of PMA is not obtainable, that the outcome

of this proceeding could be affected by a credibility contest between Ms. Deans and Mr.

Garman (the latter already being found by the state court as not credible), and that foreign

law—Chinese law governing assets in Hong Kong, and/or Cayman Islands law where

PMA was incorporated—could be germane and expensive to prove.  See generally, e.g.,

Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co., 2007 WL 816795, at *6

22

(U.S., Mar. 20, 2007) (property rights of a chapter 7 debtor are determined by relevant non-bankruptcy law unless a federal interest requires a different result); but see United States v. Edwards, 905 F. Supp. 45 (D. Mass. 1995) (declining to apply the law of Barbados).

B.

Not only is it reasonable for the trustee to seek a compromise of his claims in this adversary proceeding, but the specific terms of this settlement agreement are themselves fair and equitable.  The paramount interests of creditors are respected in the proposed settlement, without unfair prejudice to the rights of any non-settling parties.

Were this proceeding tried on its merits, there are five possible outcomes: Ms. Mayer would be awarded all of the PMA assets; Ms. Deans would be awarded all of those assets; the bankruptcy estate would be awarded all of those assets; Ms. Deans and Ms. Mayer would receive all of the assets as co-owners; or Ms. Deans and Mr. Garman would be found joint owners on the date of the latter's bankruptcy filing, and so the bankruptcy estate would consist of Mr. Garman's joint ownership interest.

Only in two of the five instances would the bankruptcy estate benefit.  In the other three scenarios, the bankruptcy estate receives nothing and there would be no PMA funded distribution to creditors.  In the two trial scenarios that do result in distributions to creditors, I have detailed the benefit to them in Attachment 1 to this memorandum.

23

In sum, if the trustee for the bankruptcy estate were to obtain all $7.2 million of the PMA sales proceeds titled in Ms. Deans and currently in her possession or control, after payment to his special counsel under a contingent fee agreement, payment of estimated taxes, payment of the maximum trustee's commission under section 326, payment to the trustee's accountant, and payment to allowed priority claims, the trustee would have about $3,425,730 to distribute to unsecured creditors.  If the bankruptcy estate were a joint owner with Ms. Deans then (dividing the tax liability evenly) the trustee would have roughly $1,678,230 to distribute.  In either instance, Ms. Mayer's proof of claim of $15.8 million may not be challengeable, in light of the June 2004 state court judgments entered in her favor.  See generally, e.g., In re Knapper, 407 F.3d 573, 580 (3d Cir. 2005);  In re Wilson, 116 F.3d 87, 90 (3d Cir. 1997).  If so, Ms. Mayer would hold about 95% of all filed non-priority claims.

Were the bankruptcy estate found after trial to be sole owner of the PMA proceeds, Ms. Mayer would receive about $3.24 million and Weir & Partners about $182,000 (unless the law firm's claim were disallowed).  There would remain unpaid $12,562,000 on Ms. Mayer's prepetition claim, which remaining claim could possibly be held nondischargeable.  If the estate were found to be joint owner of the PMA proceeds, then Ms. Mayer would receive a dividend from the PMA assets of $1,586,000, Weir & Partners would receive about $89,000, and the remaining Mayer claim that could be found nondischargeable would be $14,214,000.

Clearly, the proposed settlement provides the bankruptcy estate a better outcome than the three possible trial outcomes yielding no recovery for creditors.  Furthermore, an analysis of the complicated terms of the proposed settlement, compared

24

with the two trial scenarios in which the bankruptcy estate would prevail demonstrates

that the settlement would offer a reasonable dividend to creditors, given the uncertain

outcome of the merits of the case.

Under the proposed settlement, the chapter 7 trustee and his counsel have

agreed to discount their administrative allowances.  Ms. Mayer has agreed to discount her

claim and to partially subordinate it (for purposes of distribution of the PMA proceeds

only).  As a result, detailed in Attachment 2 to this memorandum, the amounts available

to non-settling unsecured creditors actually exceeds their dividends if the bankruptcy

estate were found to be joint owner of the PMA assets with Ms. Deans.

Although the trustee would have only about $210,000 to distribute to

general unsecured creditors under the settlement, Weir & Partners, for example, would

receive about $105,000.  And Ms. Mayer's remaining claim in this bankruptcy case,

which may or may not be nondischargeable, would be reduced to $11,852,447.  This

remaining claim figure is less than the remaining claim if the trustee were to prevail either

in whole or in part.  Moreover, the settlement agreement expressly provides that the

distribution to Ms. Mayer is pursuant to paragraph 5 of the June 2004 order, which may

be of some assistance to the debtor in his state court litigation.

Because of the size of Ms. Mayer's claim in relation to other claims,

because of the provision to pay at least a 10% dividend to other unsecured creditors, and

because of the agreement to cap administrative expenses below that to which the trustee

and his counsel might otherwise be entitled, under the terms of the proposed settlement

unsecured creditors would receive a greater distribution than if the bankruptcy estate is

found to be a joint owner of the PMA assets with Ms. Deans, and only somewhat less

than if the trustee were to prevail completely.  In addition, while the trustee has agreed

not to challenge Ms. Deans' settlement claim of $2,500,000, a bankruptcy court can grant

standing to a creditor to object to the proof of claim filed by another creditor in

appropriate circumstances.  See, e.g., In re Thompson, 965 F.2d 1136, 1147 (1st Cir.

1992); see generally Official Committee of Unsecured Creditors of Cybergenics Corp. ex

rel. Cybergenics Corp. v. Chinery, 330 F.3d 548 (3d Cir. 2003).[9]  And the settlement

agreement does not preclude such a challenge.

Therefore, even with the trustee's payment of all taxes due from the sale of

the PMA stock, the proposed settlement would provide a fair return to unsecured

creditors, given the risks involved to the trustee in litigation.[10]

In addition the debtor's ability to adjudicate his rights in state court are

unaffected by this settlement, including Mr. Garman's contention that he held no

ownership interest in this asset.  See Monus v. Lambros, 286 B.R. 629 (N.D. Ohio 2002)

(trustee's settlement did not adversely affect the debtor's interest as it was without

prejudice to the debtor's assertion of rights in a non-bankruptcy forum), aff'd, 63 Fed.

Appx. 215 (6th Cir. 2003).   Furthermore, his potential nondischargeability liability to Ms.

Mayer on her remaining claim is less than if the trustee were to prevail in the litigation.

Accordingly, I conclude that the proposed settlement is fair and equitable

---

[9]Normally, only a chapter 7 trustee has standing to object to claims.  As I observed
at the hearing, the notion that Ms. Deans could possibly hold a claim under section 502(h) is
problematic.  Thus, I would be likely to grant standing to a creditor to challenge her claim.  (And
Ms. Deans's counsel acknowledged at the hearing that the provision of the agreement granting
her an unsecured claim was not highly valued by her.)

[10]In addition, Ms. Deans has agreed to quitclaim her 90% interest in Seitzross
International and its affiliate entities, which interest may have some value to the estate.

and falls within the required range of reasonableness.  An appropriate order shall be

entered.[11]

---

[11]In approving this settlement, I do not retain jurisdiction over future disputes that would have no effect upon the administration of this chapter 7 bankruptcy case.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| RAY F. GARMAN, III | : | |
| Debtor | : | Bankruptcy No. 05-37483bif |

_____

| | | |
|---|---|---|
| GARY SEITZ, Chapter 7 Trustee and MIA MAYER GARMAN | : | |
| | : | |
| Plaintiffs | | |
| v. | : | |
| RAY F. GARMAN, III and WAVERLY DEANS | : | Adversary No. 06-0608 |
| Defendants | : | |

...................................................

ORDER

...................................................

AND NOW, this 27th day of March 2007, for the reasons stated in the
accompanying memorandum, it is hereby ordered that the trustee's motion to approve his
amended settlement agreement, dated March 9, 2007, with co-plaintiff Mia Mayer
Garman and defendant Waverly Deans is granted.   The terms of the settlement agreement
may be enforced by any court of competent jurisdiction.

It is further ordered that the preliminary injunction is dissolved to enable
Ms. Deans to comply with the terms of this settlement.

It is further ordered that approval of this settlement is without prejudice to
the rights of defendant Ray F. Garman, III, as those rights exist under applicable non-
bankruptcy law.

Finally, the clerk of court shall mark this proceeding settled and closed.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Scott M. Orloff, Esq.
Willig Williams & Davidson
1814 Chestnut Street
Philadelphia, PA 19103

Samuel Israel, Esq.
Fox Rothschild, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103-3291

Edmond M. George, Esq.
Obermayer Rebmann Maxwell & Hippel, LLP
1617 John F. Kennedy Blvd.
One Penn Center, Suite 1900
Philadelphia, PA 19103

Walter Weir, Jr., Esquire
Weir and Partners, LLP
1339 Chestnut Street, Suite 500
Philadelphia, PA 19107

Mr. Ray F. Garman, III
P.P. #9987022
Alternate Special, Detention Center
8101 State Road
Philadelphia, PA 19136

The Honorable Robert J. Matthews
Court of Common Pleas of Philadelphia County
Family Court Division
34 South 11th Street, Room 203
Philadelphia, PA 19107

**ATTACHMENT 1**

**I. PMA PROCEEDS JOINTLY OWNED BY DEANS AND TRUSTEE**

net to Deans      $3,115,500.00    (1/2 of 7.2m minus 1/2 of tax)

to estate         $3,600,000.00

| | |
|---|---|
| trustee's maximum commission from section 326 | $131,250.00[12] |
| trustee's attorney-35%[13] | $1,260,000.00 |
| half of $969K tax liability | $ 484,500.00 |
| trustee's accountant | $ 30,000.00 |
| priority claims | $16,020.08 |
| secured claims | $0[14] |
| subtotal payout | $1,921,770.08 |
| Amount available for general unsecured creditors | $1,678,229.92 |

| Creditor[15] | Percentage of unsecured claims | Pro rata distribution $1.678m |
|---|---|---|
| PA Dep't of Revenue ($3,506.54) | 0.02% | $352.05 |
| IRS ($24,269.76) | 0.15% | $2,436.64 |
| Weir & Partners ($887,995.09) | 5.31% | $89,152.93 |
| Mia Mayer Garman ($15,800,000.00)[16] | 94.52% | $1,586,288.31 |
| **Total Claims    $16,715,771.39** | **100%** | **$1,678,229.92** |

**remaining on Ms. Mayer's claim: $14,213,712**

---

|  | |
|---|---|
| [12] 1,250.00 | 25% of 5,000 |
| 4,500.00 | 10% of 45,000 |
| 47,500.00 | 5% of 950,000 |
| 78,000.00 | 3% of 2,600,000 |

[13]This assumes that the counsel would receive the median of the contingent fee range of $30% to 40%.

[14]Bank of America's secured claim of $21,355 is presumed to have been paid from its collateral.  The trustee testified that he thought the claim had already been paid from the sale of the debtor's vehicles.

[15]Assuming no claims are disallowed.

[16]Although Ms. Mayer asserts a secured claim, no collateral was identified.  I therefore assume for purposes of this contested matter that her claim would ultimately be classified as unsecured.

\                    **II. TRUSTEE  RECEIVES ALL PMA SALE PROCEEDS**

to estate              $ 7,200,000.00

trustee's commission      $239,250.00[17]
trustee's attorney-35%    $2,520,000.00
PMA taxes             $969,000.00
trustee's accountant      $30,000.00
priority claims          $16,020.08
secured claims              0.00

subtotal payouts       $3,774,270.08

total to estate for      $3,425,729.92
unsecured creditors

| Creditor | Percentage of unsecured claims | pro rata distribution of $3.425m |
|---|---|---|
| PA Dep't of Revenue (3,506.54) | 0.02% | $718.63 |
| IRS ($24,269.76) | 0.15% | $4,973.84 |
| Weir & Partners ($887,995.09) | 5.31% | $181,985.70 |
| Mia Mayer ($15,800,000.00) | 94.52% | $3,238,051.75 |
| **Total Claims   $16,715,771.39** | **100%** | **$3,425,729.92** |

**remaining on Ms Mayer's claim: $12,561,949**

---

[17] 1,250.00        25% of 5,000
    4,500.00        10% of 45,000
    47,500.00       5% of 950,000
    186,000.00      3% of 6,200,000

**ATTACHMENT 2**

**DISTRIBUTION OF PMA PROCEEDS UNDER THE PROPOSED SETTLEMENT**

Deans pays estate                            $6,900,000.00   (Deans retains Taos plus other unspecified property)

trustee pays Mayer                           $3,875,000.00
trustee pays Deans                           $1,125,000.00
taxes on PMA                                 $969,000.00
trustee's attorney fees (capped)             $500,000.00
trustee's commission (capped)                $175,000.00
trustee's accountant                         $30,000.00
priority claims                              $16,020.08
secured claims                               0.00

subtotal payouts                             $6,690,020.08

remaining proceeds payable
to unsecured creditors                       $209,979.92

**Distribution including claim of Waverly Deans**

| Creditor | 10% dividend | Claim amounts less 10% dividend | Percentage of unsecured claims | Pro rata distribution of $118,402 remainder | Paid on unsecured claims |
|---|---|---|---|---|---|
| PA Dep't of Revenue ($3,506.54) | 350.65 | 3,155.89 | 0.05% | 64.16 | 414.81 |
| IRS ($24,269.76) | 2,426.98 | 21,842.78 | 0.38% | 444.05 | 2,871.03 |
| Weir & Partners (887,995.09) | 88,799.51 | 799,195.58 | 13.72% | 16,247.22 | 105,046.73 |
| Waverly Deans (1,375,000.00) | 1,375,000.00 | | 23.61% | 27,953.02 | 27,953.02 |
| Mia Mayer (3,625,000.00) | 3,625,000.00 | | 62.24% | 73,694.33 | 73,694.33 |
| **Totals  5,915,771.39** | **91,577.14** | **5,824,194.25** | **100%** | **118,402.78** | **209,979.92** |

**Distribution excluding claim of Waverly Deans**

| Creditor | 10% dividend | Claim amounts less 10% dividend | Percentage of unsecured claims | Pro rata distribution of $118,402 remainder | Paid on unsecured claims |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| PA Dep't of Revenue (3,506.54) | 350.65 | 3,155.89 | 0.07% | 83.99 | 434.64 |
| IRS (24,269.76) | 2,426.98 | 21,842.78 | 0.49% | 581.28 | 3,008.26 |
| Weir & Partners (887,995.09) | 88,799.51 | 799,195.58 | 17.96% | 21,268.34 | 110,067.85 |
| Mia Mayer (3,625,000.00) | | 3,625,000.00 | 81.48% | 96,469.17 | 96,469.17 |
| **Totals 4,540,771.39** | **91,577.14** | **4,449,194.25** | **100%** | **118,402.78** | **209,979.92** |